Good morning, Your Honors. I'm Richard Sagerbloom for the appellant, Mr. Overstreet. This is an appeal from a summary judgment ruling against my client who had sued the Clark County School District for race discrimination. And to summarize, as far as the appeal goes, I think it involves the issue of what's necessary to show pretext during the summary judgment motion sufficient to create a question of fact. But let me go through the facts for you, if I can. I think we're familiar with the factual background. It seems to me that to show pretext in the summary judgment context here, you really have to rely on inference. Is that right? Yes, there's no question about it. Because your best evidence is that the scores were manipulated. Right. It was a two-step process. My client made it to the top five. They were interviewed. The initial interviews showed that he was ranked second in those. And then somehow or other, they met, the committee met, revised the scores. He comes in third. And then the committee, and this is the second part that's critical, the committee unilaterally decides they're only going to refer the top two. Right. So when you get to trial, if you get that far, you say the scores were manipulated, and we know it was because of race, because what? Well, and that's the question. Can you infer race without somebody saying, you know, I don't want you because you're an African-American or because whatever? Because we don't have that, obviously. But what you have, as I said, is this process where they took my client and basically took him out of the loop. And I believe under the Hicks case, as long as you can show that the explanation they gave is not believable, then you can infer race. Now, the jury could say it wasn't race, it was they didn't want it for some other reason. But it's pretty clear, given this two-step process, that these five panel members did not want my client to be referred to the superintendent. Well, why wouldn't, if we accept that you've met your pretext burden here, why wouldn't then everyone that doesn't get a job be able to bring a discrimination suit? I mean, you know, what have you shown? He didn't get the job. That's true. But then there was also someone else that was ranked higher and didn't get into. There were, what, four other people that didn't get the job too, right? Right. And so why wouldn't all those four people, based on, why wouldn't they be able to make the same claim? Well, two reasons. First, of the five, he was the only minority. He was the only African-American. Secondly, as I said, when you look at the process, he was initially ranked number two. They manipulated it so that he came in number three, and then they decided we're only going to refer the top two. So if you look at both steps of the process, he was the only one who was bumped out of consideration. Well, but who was the guy that was first before they manipulated it? He came in second. And then he didn't get the job, right? Right. So why can't he bring a lawsuit too? Well, because he was referred to the superintendent. See, it's a two-step process. Basically, they used these two steps to make sure that my client couldn't be considered. Well, but what evidence do you ‑‑ okay, you first have to show that, I mean, obviously there's a lot of employment practices where you get certain things to you, you get certain people that get to it, and then they narrow it further and refer it on. So are all of those, anyone that doesn't get into the top two there, then if they're a minority, that's all they have to show for pretext? No, that's not all. Well, what else do you have? I have both the fact that this committee met and on their initial review thought that my client was rated number two, and then they manipulated it so he's number three, and then they decide without any kind of ‑‑ there's no rule that says only the top two candidates go or all five candidates go. They made up their minds. They made the decision to only refer the top two candidates. So if they sit in a group and say we're going to take this guy out of the top two, and then they say, well, we're going to only refer the top two, then that two‑step process, I believe, shows that they didn't want him, and because he is the only minority, that's sufficient to create the inference. Now, again, that does not mean the jury has to agree with me, but it's the fact that they did both steps and there's no rules that say this is how you do it. Let me ask you a few questions about the ‑‑ you characterized it manipulation. What criteria did they use to adjust the scores? Well, that's another issue. They ‑‑ again, remember, this is a summary judgment. They submit in the summary judgment, lookit, we went through this process, this committee ranked these five people, we only sent the top two, and your client wasn't one of them in the story. So I go back in the opposition and say, wait a minute, if you look at the criteria, when they first look at these people, the scores were different, and then for some reason they changed them. So then in their reply brief ‑‑ Well, look, if you go through their screening and recommending procedures that were utilized for this particular hiring decision, if you read it carefully, it does ‑‑ you get a sense that at each step of the way, they try to reach some, quote, unquote, consensus. First, the initial screening of the applications, they do a telephone interview, and then they rate them, and then they try to come to some consensus. Then in the third stage, the fifth stage, when they do the on‑site interview under the plan, they do the interview, and then each rater rates them according to the model questioned on their own. Built into that process, there was some notion of consensus. Hold on. What they did, though, what they come back and they say is, well, we have to adjust all the scores within one point. Now, I looked high and low in this process to figure out where they got that from, and the declaration by the custodian of records that they used to say that they followed this process in prior hiring decisions does not document how they arrived at or where they get this idea of adjusting, that consensus means you adjust within one. Did you explore that with them? I didn't, because it didn't come up until their reply brief, which I never had a chance to respond to. You mean in the district court. Right. So, like I said, that was news to me that they had this process where you supposedly rank it within one point. And furthermore, just to look at the score. What's wrong with that? Well, probably nothing. But if you look at their scores, one guy raised his scores from threes to fives. Now, if you only had to raise your scores to within one point, all you would have to do is to raise it to four. So why would he even jump two points? That doesn't even correspond to what they're claiming, which is we addressed everything to get to be the one point. But, again, they have affidavits from every single person on the panel. None of them says we used a one-point process. You have an affidavit of custodian records, but I don't think it's admissible, says I ---- Did you object to that declaration in the district court? Again, it was in reply brief. Well, ask my question. Did you object to that declaration in the district court? I did. In my ---- it's a convoluted process because we had two summary judgment motions. In the second summary judgment motion, I did object to the declaration. Is it in the record someplace? Yes. Discovery is closed in this? Yes, at this point, because it's summary judgment. If we went back ---- No, but, I mean, did you have a ---- under the original discovery schedule? Yes. The summary judgment came after. I did ask for a ---- A 56-F on the ADEA claim. It just strikes me as very odd that these factual issues would come in after discovery. Well, Your Honor, I apologize for that. Well, no, you didn't send her the affidavit. They did. I know. But I'm saying part of the problem with these cases are if you could go out, if your plaintiff had unlimited money, you could go out and depose everybody. You could probably get to a lot of these questions earlier on. But when you look at the record and it looks pretty simple, and then all of a sudden you see these things and they come clear when you do the summary judgment motion, and all of a sudden you see this stuff and you bring it to the Court's attention and then ---- Did you have that screening and recommending procedure assistant superintendent facilities and transportation policy statement before you ---- Yes. But that doesn't say anything about a one-point ---- No, it doesn't. But it talks about consensus. Right. Are you contesting the grant of summary judgment on your age discrimination claim? Well, if you follow the logic of the inference, then it would also apply to age because ---- Well, but how can you make a prima facie case when the person that got the job is ---- there's only a year's difference. The Ninth Circuit has ---- there's a case, and I quote it right here, but it says that just because someone in the same protected category gets the position doesn't mean you can't prove a prima facie case. And what I didn't ever get was the ages of the other people that were involved. But I think gay race is clearly a much stronger claim. What evidence in the record can you point me to of racial animus? There is nothing which says race other than the fact my client is African American and the way that he was treated in the process. Thank you, Counselor. Your time has expired, but we'll give you a minute for rebuttal. May it please the Court. My name is Bill Hoffman. I'm the General Counsel for the Clark County School District. The Clark County School District is the fifth largest public school district in the United States, also the fastest growing. We build about a school a month and have for many years. In 1997, we needed to have somebody that was going to supervise this process, and so we screened across the country and obtained 45 candidates. Of the 45, the screening committee selected five. One of the five was Mr. Overstreet. The screening committee itself, the composition, I think, is important and relevant in this case. Only two of the five on the screening committee were Clark County School District employees. They were principals of the school. The reason for that is because they were the consumers or they were the customers of the facilities director. The other three, one was a construction guy, construction company owner, who had built schools for the district. Another one was a member of the Bond Oversight Committee, which is a civilian committee, a public committee of citizens who oversee the expenditures of the bond funds that Clark County had in 1998. We had a $3.5 billion bond fund. Before that, there was a similarly large bond fund, and so the Bond Oversight Committee oversaw that from the citizens' point of view. So one of the members of that Bond Oversight Committee was on, was one of the five members of the selection committee. And then the fifth member of the selection committee was a former director of facilities who had built schools about five or six years before. That's important because those individuals were not, although the two district employees were aware of the selecting process, the other three were not because they weren't normally in the business of selecting district employees. The court has correctly pointed out the screening and recommending procedure called for the responses to be rated according to the protocol regularly employed by the district for interviews. That's in the record at page 458. In order to understand what that means, though, you need to have the explanation that's in the affidavit that's in the record from the custodian. Ms. Engel's affidavit? Yes, that's Hillary Engel's. Now, is there, I'm curious, is there anywhere else in the record about the one-point adjustment or is that the only place in the record that that's mentioned? That's the only place that explains it, although if you take the fact that the screening procedures called for that regular protocol to be applied and you understand what the protocol is and then you go and you see how each of the scores were changed, you can go through, for example, look at question one and see what the different ratings were and you can see that they were all adjusted to within one. So there's no mystery, I don't think, that what happened was the administrator or the supervisor, if you will, of the selection process explained this to the members of the panel when they did their scoring and said you have to There's no affidavit from anybody that says that. There is no affidavit because, frankly, we didn't know, the district didn't know that that was an issue until for the first time we heard it in the response, the opposition from the plaintiff. It's awfully late in the game to be tendering what is the pivotal evidence in this case, though.  A person who was not on the screening committee says this is what the screening committee did and here's the explanation, and that is the key bit of evidence that's awfully late and it puts the plaintiff in a very, very awkward position because at that point the plaintiff can't do anything. Discovery is closed. His time for briefing is up. Well, the documents that the plaintiff was using for this theory were worksheets, if you will. Right, but it shows the numbers were manipulated, and that's fairly powerful evidence that something was amiss, particularly when they're, I mean, if you credit the explanation, it was an informal protocol on the adjustment. It's not contained in the formal protocol that we're going to do everything within one point, and particularly since, you know, Clark County is so large and transparency is obviously important, it looks pretty bad, I guess, to be blunt about it, absent that explanation. Well, the other thing I think that's important is, and I think the Court below pointed this out, is merely because Mr. Overstreet was treated differently, the Court pointed out that all of the other applicants also had their scores adjusted. So there's no indication that the adjustments were based upon Mr. Overstreet or Mr. Overstreet's race. The suggestion is that it was applied to everyone, and the Court pointed out that even if you threw out the most radical judgments, I think Orlando Sandoval, one of the five, the bond oversight representative, even if you threw out his scorings, it was still clear that the consensus or the sentiments of the Board of this panel were that the number one and number two candidates were clearly superior. And their affidavit said that those candidates, that their candidate, that Heron was clearly superior. So while it's true it's pivotal evidence, if you stand back a bit from the process and look at what this panel said, the panel was very clear that it had found a legitimate non-discriminatory, represented a legitimate non-discriminatory basis for the decision, and that is that Heron was the superior candidate. Well, except that, everybody proceeded on the same scoring to begin with, and there was a consensus of two, and it came out differently after the rescoring. I mean, that's the problem when, you know, I think all of us have been on selection committees where scoring is done, and if somebody changes the rules in the middle of the game, it's often done to promote a particular candidate. Whether that reason is discriminatory or not may be another question, but it's certainly bad procedure, unless it's completely spelled out ahead of time so everybody knows what the game is. I mean, in this particular case, statistically, the requirement that you achieve consensus on a score ends up varying the results widely. I mean, the numerical results then end up completely off and in the aggregate by making these adjustments along the way. So I'm not even, you know, I'm not sure that achieving consensus on the score actually achieves the result of achieving consensus on the candidates. Well, from your perspective, what did he have to show for pretext? I mean, in terms of you've stated what the procedure is, that you stated what your reason was for doing it that way, and assuming that you met that burden, then it goes back to show pretext. What in the record shows that that's either false or that there was any discrimination? What shows that there was no discrimination? Well, what in the record did the plaintiff, or in this case, well, I guess it would, did Mr. Overstreet show? He needed to show some sort of pretext, and I don't think that he showed any pretext, if that's what you're asking me. If the panel wanted to select out Mr. Overstreet for some reason, they would have done that in the midst of the group of 45 when they did the first screening. There are two different screening processes that are going on. You said they changed the rules in the middle of the game. They didn't. They did a very, I think, a very objective screening in the beginning to go through the application, the educational background, the experience, scoring his prior experience, his education, and that sort of thing. So that's a very objective process. But then you start afresh when you go to the actual interviews and the side interviews, because now you're talking about how individuals get along with each other, how they respond, what their experience is on how they would deal with particular problems. So we've changed the rules a little bit, and it is going to be subjective. But the makeup of that committee, I think, is one of the most important things. If this was all the assistant superintendents who worked directly for the district superintendent, and you might judge, for example, that there was some sort of a conspiracy, if you will, where we're going to select a particular individual who happened to be from North Carolina, if that was going to happen, then the makeup of the panel is particularly relevant. In this case, the panel was from all over the place. You've got a couple of district people. You've got one from across country. You've got people, one is a bond oversight committee. One is a contractor, a construction contractor who builds schools for a living. It's hard to imagine that you're going to put together a conspiracy with those individuals to select out somebody. Well, that helps you on the charge which is not made, or a potential charge that's not made. In this case, you were favoring an in-house candidate versus a national candidate for those reasons. How does it help you in terms of ensuring that minority candidates had an equal shot? It would certainly have been better if you'd had minority representation on the screening committee. Oh, we did. We did. Carol Threese. I'm sorry, you're right. Carol Threese is African-American, and Orlando Sandoval is Hispanic. So two of the five were minorities in the group. Yes, that's quite correct. Let me ask you this. I still don't quite understand. There's nothing in the record then. I just want to make this, just to verify this, that when Ms. Engel states in her declaration, she says all five of the interviewers needed to arrive at scores that were within one point of each other, which was protocol regularly employed by the district for interviews. There's no basis for that. Where does she – what's the basis for that? Well, the protocol is what it is. But that protocol is not in the clear outline that was established for this particular hiring decision. That's right. But you have to – I think you can connect up a couple of facts. Number one, there is such a protocol. It was planned to be used based upon the screening. No, but there's no declaration to that effect. Well, the screening and recommending procedure says that they're going to use the protocol regularly used in such matters. It says that on page 458 of the record before they start. That's under the description of the on-site interview part. And then what you have is you have the declaration of how that works, which we put in after we heard from the plaintiff that they thought that that was a basis for discrimination. But then the very telling evidence that connects all this up is when you actually look at the score sheets. You can see on each question, when there was a case where they were not within a point, one score to two, one score to four, you can see that either one went to a 2.5 and went down to a 3.5, or they both went to a 3, or one went to a 3. I mean, you can see that in the record. So that's not mystery. That's the way that the board reached consensus. Well, is there anything in that that – I mean, was every single person adjusted? Every single person was adjusted, every single one. And most were adjusted both up and down, but each of the five candidates and the finalists had their scores adjusted one way or the other in order to reach this consensus that we're talking about. I take it there wasn't much discovery done in this case. Is that right? There was discovery done. There were some depositions, but I – it just seems odd to me that there are so many of these key issues that came out after the close of discovery. And maybe that's just one of the things that the briefing provoked on both sides. Well, the district felt like we had put together our case. We didn't think that the protocol and that the scoring change was an issue because that's what we used, and that's the way it is, and the record shows that that's what they did. So there was never a reason for us to depose anybody to establish that point. It would have been the plaintiff's burden to say, why is it that these scores have been changed? And had they asked that question of any of those five members, I think the answer would have been, well, we were told that this is the way it had to be. And that's not speculation. That's by looking at the records and seeing that they actually changed their numbers. Why did you change your number? Because we had to, to come within one point. Was it based upon racial animus? No, it was based on the fact that we had to come within a point. So if you thought he gave a great answer and I thought he did not such a great answer, let's talk about that answer and let's reach a consensus. That's the way the system works. And that's the regularly established protocol. And the plaintiff never did any of that in his discovery? They never did. They never asked that question. Okay. Any further questions? Thank you, counsel. We'll hear rebuttal. We'll give you three minutes. We questioned your opponent after the bell, and we have some questions. I'm not sure I need three minutes, but I would just say, I mean, the problem is you have them asserting this protocol, which I think as you point out really is not in the record anywhere. If you look at how the changes were made, some of the changes do not comport with the protocol because someone went from a 3 to a 5. But if this is the whole part of your case, you have a certain burden. You're bringing this lawsuit. First you have to show your prima facie case. And, I mean, it's no mystery. And then they show whatever their legitimate reason was, and then you know you have to show pretext. So why, you know, why weren't you deposing people about this? As I said in the report. I mean, because clearly there's nothing, there's no case law out there that says that I didn't get the job, and that gives you a lawsuit for discrimination. You have to show more. I mean. Well, just hypothetically, if we had deposed all five panel members, how would it have been different? I said, looking on the surface, I deposed Mr. McCord, who was the person in charge of the process. Well, you asked them why they made the adjustment. And if you're looking for knowing that you have to show that their legitimate business reason, that it's false and that it was actually for racial animus, you know, for discrimination. Well, having done this quite a bit, I've never asked somebody why they did something, and they said, oh, I did it because of his race. I mean, those. Well, but if you'd asked them how they did it, then you'd know about the one point, and then you could get further into whether that's really how they did it or, you know, go with each person. Well, again, I didn't know. I deposed the guy who was in charge of the process. He never mentioned the protocol. Their motion never mentioned the protocol. I had no idea that this one-point thing. Obviously, they had adjusted the things internally, but, I mean, to ask them why they did that, I knew that they were going to say, which is what their affidavit said, which is we didn't do it because of his race. But the fact is, when using that two-step process, and both the protocol, the one-point protocol, is not in the record anywhere, and the changes don't actually comport with that in some cases, and secondly, the decision to limit it to the top two, that is nowhere. There's no rule that says you pass the top two, the past one, the top three. Right. I think the problem for you, I mean, they've got the problem that they had some adjustments that weren't apparent from the onset. But now they've come back, and you've raised that issue. They've come back and said, here's our explanation for that. We always do it. We followed the procedure, even though it wasn't part of our written protocol, and we always have done it that way, and this is the way the scores came out. So then it's your burden now at trial to say, no, that's pretext. They were trying to exclude my client because of his race. And that's where you've got the problem, I think. Well, again, I think that's what juries do, is rule on those type of issues. They have submitted their affidavits from each one of the five members. Did you ask for 56F continuance? Just on the age claim. You didn't ask for it on why not? Because this issue didn't come up until their reply brief. Well, I mean, once that was presented to you, you didn't think about asking the district court judge for it? I didn't because I didn't. I mean, I looked at Ms. Engel's affidavit. There was nothing else on the record. I didn't think it was going to be a big issue. But, again, even if you assume that the one-point protocol is in place, that doesn't explain what happened here. I mean, there is a consensus, but the consensus, obviously, was that Mr. Overstreet would not be referred to the superintendent. And that's our point, is that the one- Well, the consensus means, if you look at these sheets, it has different articulation presence, uses language easily, fluently, produces clarity, assertive, sense of ease, knowledge, I mean, consensus could mean they've got to talk about these various factors with respect to each individual, assess the individual, and see how they all see, you know, why somebody saw one individual differently than the other person did. I don't disagree. I mean, it's clearly there could be a legitimate explanation for what happened. But in these cases, that's what Hicks said, which is basically you don't mandate a finding of discrimination if you prove pretext. You just allow the jury to conclude that there was discrimination. And that's the difference. We're not saying that there's a – there's a- But at this stage, really, the only burden that you have is to show that there's a genuine tribal issue of fact with respect to pretext. Right. That's my opinion. And given- Well, I guess their response is that, you know, based on the evidence that's here, no reasonable trial of fact could conclude. And I don't – I appreciate the difficulty of the issue, but I think if you're going to let pretext be one of those things where you don't have to show somebody made a racial comment, you just look at how the things happen, and if there's suspicions in a subjective process like this where five people get together- I mean, the case law does talk a little bit more. You've got to be able to look a little more closely at subjective processes. Right. When there's no criteria in the record, and then they come forward and make these two decisions, not just one. There's the first one, which says we're going to balance them out, and if you look at how they balanced them, they didn't balance them out according to that protocol in some cases. And secondly, when you limit it to two and he goes from second to third and then, bam, by the way, he's dropped out- Did you have the numbers, this adjustment, when you filed the suit? No. Right. So that came to you later, but obviously you felt when you filed the suit there was a case of racial discrimination. What other factors led you to that conclusion apart from the numbers and adjustment? All we knew was we had a professional engineer who had come in second to the same job several years previously. He had been excluded erroneously a couple of years previously. And then this process, he goes through this process, and on paper looks-he's a professional engineer. The guy that got the job is a doctor of education or something in charge of construction of the largest school district in the country. We thought we had-we wanted to know what happened, frankly. I mean, a lot of times you don't know until you get in there. And then when you get in there and you look at the stuff, it's like sausage. I mean, like legislation. It may not-it's an ugly process. And maybe it was legitimate. It's just that it's an ugly process. And when you have the minority, the only minority, being ground up like that, I think that should raise a concern for everybody. Thank you both for your arguments. They've been helpful. The case that's heard will be submitted. And we will proceed to the next case in the oral argument calendar, Dominguez-Curry v. Nevada Transportation Department. Thank you.
judges: Thomas, Paez, Callahan